UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION


BILL W. WRIGHT,                          )
                                         )
                        Plaintiff,       )
                                         )
            v.                           )      No. 2:07CV56 AGF
                                         )
CITY OF SALISBURY, MISSOURI, et al.,     )
                                         )
                        Defendants.      )


**<u>MEMORANDUM AND ORDER</u>**

This matter is before the Court[1] on Defendants' Jointly Filed Motion for Summary

Judgment (Doc. #16). For the reasons set forth below, the motion shall be granted in part

and denied in part.

Plaintiff Bill W. Wright brings this action pursuant to 42 U.S.C. § 1983 alleging

that Defendants, while acting under color of state law, terminated Plaintiff's employment

as a police officer with the City of Salisbury in retaliation for and in violation of

Plaintiff's First Amendment right to free speech. Defendants are the City of Salisbury,

Missouri ("City"); Joe Fehling, Mayor of the City of Salisbury; and Bill Leach, Doug

Farnen, Reuben Tisdale, Eddie Hubbard, Mitchell Stephens, and John Standfield,

members of the City's Board of Aldermen. Plaintiff also brings claims under state law

alleging that all Defendants violated the Missouri Sunshine Law, and that Defendant City

_____

[1]All matters are pending before the undersigned United States Magistrate Judge, with
consent of the parties, pursuant to 28 U.S.C. § 636(c).

of Salisbury wrongfully discharged him in violation of Missouri public policy. Plaintiff seeks relief against the individual Defendants in both their individual and official capacities. Plaintiff requests equitable relief in the form of reinstatement, statutory penalties, and monetary relief, including actual and punitive damages.

All Defendants now move for summary judgment claiming that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law. Plaintiff has responded to Defendants' motion to which Defendants have replied. With leave of Court, Plaintiff filed Additional Suggestions in Opposition to Defendants' motion.

Pursuant to Fed. R. Civ. P. 56(c), a court may grant summary judgment if the information before the court shows that there are no material issues of fact in dispute and that the moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The burden of proof is on the moving party to set forth the basis of its motion, Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986), and the court must view all facts and inferences in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 587 (1986). Once the moving party shows there are no material issues of fact in dispute, the burden shifts to the adverse party to set forth facts showing there is a genuine issue for trial. Id. The non-moving party may not rest upon his pleadings, but must come forward with affidavits or other admissible evidence to rebut the motion. Celotex, 477 U.S. at 324.

## Count I – First Amendment Free Speech

### A.     Background

In 2006, Plaintiff began his employment as a law enforcement officer with the City.  On October 11, 2007, the City's Board of Aldermen voted to eliminate the position then held by Plaintiff, thereby effectively terminating Plaintiff's employment with the City.  Prior to Plaintiff's termination, Plaintiff engaged in speech, questioning Mayor Fehling's alleged instruction to him to refrain from stopping and arresting suspected drunk drivers within the City.  It is this speech which Plaintiff claims caused the Board of Aldermen to terminate his employment.  Defendants argue that they are entitled to judgment as a matter of law on this claim inasmuch as Plaintiff's speech did not constitute protected speech under the First Amendment and was not the cause of his termination.[2]

To establish a free speech retaliation claim, Plaintiff must prove that he engaged in protected activity, and that his activity was a substantial or motivating factor in his employer's decision to terminate his employment.  <u>McCullough v. Univ. of Ark. for Med.</u>

---

[2] In Count I, Plaintiff also asserted a claim that Defendants' failure to permit Plaintiff to pursue an employee grievance in relation to his termination violated his right to procedural due process.  However, Plaintiff withdrew this claim in his Response to Defendants' Motion for Summary Judgment.  (Doc. #20 at 18.) ("In order that the issues are clarified in this matter, Plaintiff affirmatively states herein that any claim he might have raised in his initial complaint concerning a due process violation is not being pursued by Plaintiff[.] . . . Plaintiff is no longer seeking redress for any alleged violation of his due process rights.")  The Court therefore does not address Plaintiff's due process claim in this Memorandum and Order.

Scis., 559 F.3d 855, 865 (8th Cir. 2009) (citing <u>Altonen v. City of Minneapolis</u>, 487 F.3d 554, 559 (8th Cir. 2007)); <u>Cox v. Dardanelle Pub. Sch. Dist.</u>, 790 F.2d 668, 672-76 (8th Cir. 1986); <u>see also</u> <u>Hughes v. Stottlemyre</u>, 506 F.3d 675, 678 (8th Cir. 2007) (establishing a case of retaliation under the First Amendment), <u>cert. denied</u>, 128 S. Ct. 1741 (2008).  If a plaintiff meets this burden, the burden then shifts to the employer to show that it would have taken the same action regardless of the plaintiff's speech activities.  <u>McCullough</u>, 559 F.3d at 865 (citing <u>Altonen</u>, 487 F.3d at 559).

A public employee engages in speech protected under the First Amendment if he speaks "as a citizen on a matter of public concern."  <u>Garcetti v. Ceballos</u>, 547 U.S. 410, 418 (2006); <u>Davison v. City of Minneapolis, Minn.</u>, 490 F.3d 648, 655 (8th Cir. 2007). This is a question of law for the Court and must be determined by the content, form, and context of a given statement, "as revealed by the whole record."  <u>Connick v. Myers</u>, 461 U.S. 138, 148, 148 n.7 (1983); <u>McGee v. Pub. Water Supply, Dist. #2 of Jefferson County, Mo.</u>, 471 F.3d 918, 920 (8th Cir. 2006).[3]  This determination, itself, is a two-step process by which the Court must decide both whether the employee spoke as a "citizen" and whether the speech was on a matter of public concern.  <u>Garcetti</u>, 547 U.S. at 421 (holding that government employee did not act as a citizen when speech was made, but

_____

[3]  The Court notes that several other Circuits have determined this to be a mixed question of fact and law.  <u>See, e.g.</u>, <u>Reilly v. City of Atlantic City</u>, 532 F.3d 216, 227 (3d Cir. 2008), <u>cert. denied</u>, 129 S. Ct. 1316 (2009); <u>Andrew v. Clark</u>, 561 F.3d 261, 267 (4th Cir. 2009); <u>Posey v. Lake Pend Oreille Sch. Dist. No. 84</u>, 546 F.3d 1121, 1129 (9th Cir. 2008).

not challenging Circuit Court's finding that speech addressed a matter of public concern); McGee, 471 F.3d at 920-21 (holding that no First Amendment protection arises if government employee speaks only on matters of personal interest, as opposed to "matters that are of concern to the general public," or speaks on matters of public interest but does so in the course of his employment duties and thus not as a citizen); see also Davis v. McKinney, 518 F.3d 304, 312 (5th Cir. 2008); Mills v. City of Evansville, Ind., 452 F.3d 646, 647-48 (7th Cir. 2006); Foley v. Town of Randolph, 601 F. Supp. 2d 379, 383, 383 n.4 (D. Mass. 2009) (citing Curran v. Cousins, 509 F.3d 36, 45 (1st Cir. 2007)).  If the employee fails to satisfy both of these prongs, he has no First Amendment cause of action based on his employer's reaction to the speech.  Garcetti, 547 U.S. at 418.  If, on the other hand, the employee demonstrates that he spoke as a citizen, "that is, outside the scope of employment[,]" on matters of public concern, the First Amendment offers protection if his speech survives the balancing test of Pickering v. Board of Ed. of Township High School District 205, Will County, Illinois, 391 U.S. 563 (1968).  McGee, 471 F.3d at 920.  Pickering requires the Court to determine "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public."  Garcetti, 547 U.S. at 418 (citing Pickering, 391 U.S. at 568).

**B.** **Evidence before the Court on Defendants' Motion**

As relevant to Plaintiff's First Amendment claim, the following facts are not in dispute:

On September 21, 2007, Mayor Fehling called a meeting at his office which the Chief of Police, Jim Blackwell, and Plaintiff attended. The meeting occurred on Plaintiff's day off, and he was not in uniform. On September 22, 2007, Plaintiff wrote a letter, on his personal letterhead, addressed to "To Whom It May Concern," regarding the meeting that occurred on September 21 between himself and Mayor Fehling. In this letter, Plaintiff stated that the Mayor had called the meeting in response to ongoing citizen complaints regarding Plaintiff making traffic stops for minor violations. Plaintiff continued in this letter as follows, regarding DWI enforcement:

> Mayor Fehling then spoke to me about D.W.I. enforcement. He commented on the fact that I had requested of the Police Committee, two days prior to this meeting, to go for training to become a Standardized Field Sobriety Tests (SFST) instructor, saying that he was having second thoughts about it due to me aggressively attempting to apprehend drunken drivers within the city. He stated to me that I should allow drunken drivers to drive within the city as long as they are on secondary roads and not leaving town on the highways. He said the danger to the public from drunken drivers was minimal within the city on city streets because they were not traveling as fast as those on the highways. He said if I got behind someone I suspected of drunken driving, I would just let them continue driving to their destination (be it home, etc.) here in the city.

(Def. Ex. R at 1, Doc. #17-15 at 7.)[4] Throughout the remainder of the letter, Plaintiff referred to the Mayor's alleged instruction and how it would -- or would not -- affect Plaintiff's ability to perform his duties as a police officer. Plaintiff contended in the letter

---

[4] Defendant Fehling denies giving this directive to Plaintiff at the meeting. But Defendants correctly recognize in their memorandum that, for purposes of determining whether Plaintiff's speech contained in this letter was made as a citizen or public employee in this context, the Court must assume that the encounter between Plaintiff and Mayor Fehling occurred as described by Plaintiff. (Doc. #17 at 7, n.2.)

that he informed the Mayor that "if I believed I could not [sic] longer function as an ethical police officer, I would have to consider resigning[,]" and, further, that "I must perform my sworn duties and continue to stop people who violate the law and issue warnings, citations, or make arrests. I cannot allow anyone to drink and drive and WILL ARREST anyone who does so." Def. Ex. R at 1-2.

Specifically referencing public safety, Plaintiff stated, "Not only is my job in jeopardy because I do my job, but Mayor Fehling has made it very clear that he believes it is okay to put the lives of citizens in jeopardy to squelch complaints from his constituents." Id. at 2. Echoing these same thoughts later in the letter, Plaintiff stated, "The actions of our Mayor in this case are appalling to any good and decent person. The fact that he has taken the stance of allowing our citizens [sic] lives to be in jeopardy by drunken drivers is unforgivable." Id. at 3. Plaintiff also raised the potential liability of the City, as well as his own liability as a police officer, if a drunken driver were to be involved in an accident and an officer was or should have been aware that the driver was impaired. Id. at 2.

In this letter, Plaintiff also expressed concern regarding his employment status if he were not to abide by the Mayor's instruction:

> Mayor Fehling has put me in fear of loosing [sic] my job for doing it appropriately and ethically. I cannot, in good conscious [sic], follow his directions and must continue to perform my duties as I always have. I have to speak out against the Mayor's directions and now fear retribution for doing so. Do I have to live in fear that I am going to be terminated for any minor thing that is made up about me? Do I have to fear that if someone complains about me having stopped them for a violation of the law or

checking their well-being that my employment with the police department will be terminated?

I cannot live in fear that if I do my job I will no longer have it. The right thing to say to people who complain about being stopped is that if they violate the law they will be stopped. Law enforcement officers cannot change what they do because of the whims of some people. For the safety of all citizens, law enforcement officers must perform their sworn duties appropriately.

Id. at 2-3. Plaintiff concluded this letter with a request for "clarification from the City Council as to whether or not I am expected to follow the Mayor's new policy on how we are to enforce the laws in our city." He further declared:

Neither the Mayor nor anyone else has the right to tell police officers which laws they will enforce or not enforce. We are bound to enforce the laws of the State of Missouri and furthermore the United States Supreme Court has ruled that citizens have an expectation that the police will act when they observe or are aware of any criminal activity.

Id. at 3.

Plaintiff provided a copy of his letter to the Chief of Police, and they discussed providing it to the members of the Board of Aldermen.[5] Plaintiff thereafter delivered a copy of this letter to all members of the Board of Aldermen. Plaintiff also delivered a

---

[5] The facts are unclear as to whether the Chief of Police "directed" Plaintiff to send the letter to the Board of Aldermen. Plaintiff testified in his deposition that after the letter was written, Chief Blackwell instructed him to provide a copy to the Board of Aldermen. In his own deposition, Chief Blackwell specifically denied instructing Plaintiff to provide the letter to the Board of Aldermen. Rather, he testified that Plaintiff showed the letter to him and advised him that he (Plaintiff) was going to send it to the Board of Aldermen. He further testified that he did not have any objection to Plaintiff writing the letter, and that he told Plaintiff that he thought it would be a good idea to provide a copy to the Board, because "the City Council is our boss and they should know what's going on." (Blackwell Dep. at 14-15.)

copy of this letter to a representative of Mothers Against Drunk Driving ("MADD") and to KOMU, a local television news station. Plaintiff did not deliver a copy of the letter to Mayor Fehling.

On October 1, 2007, Plaintiff wrote a second letter. This letter was addressed to the City's Board of Aldermen, and like the first letter, was written on his personal letterhead. In this letter, Plaintiff stated that the Mayor had requested that he respond with proposed solutions and/or resolutions regarding the matters addressed during their September 21 meeting, and specifically, regarding the issues surrounding Plaintiff's conduct of making traffic stops for perceived minor traffic violations and DWI enforcement within the City. (Def. Ex. S, Doc. #17-15 at 10.) Plaintiff noted that he had learned that the Board of Aldermen also desired a response from him. In this letter, Plaintiff referenced incidents in which police officers leave the employment of small town agencies due to their performance of lawful duties in contravention of the desires of the citizenry and the "good old boy system." Def. Ex. S at 1. Plaintiff also referred to a meeting which occurred on September 19, 2007, between the Mayor, the Police Committee, and all of the full-time police officers at which citizen complaints were discussed. Plaintiff stated that the officers were told at this meeting that they were doing a good job and were to continue with what they had been doing. Id. at 2. With respect to his subsequent meetings with the Mayor on September 21, Plaintiff continued in his October 1 letter as follows:

What Mayor Fehling said to me during the meetings I had with him should

never be said to a police officer and I believe the Board of Aldermen has a
duty to ensure that this kind of thing never happens again to any police
officer of the City of Salisbury. Furthermore, I believe the police officers
employed by the City of Salisbury should have protections so that they do
not live in fear that they may loose [sic] their jobs for performing their
duties professionally and ethically. Police officers should not live in fear
that if they lawfully stop or arrest the "wrong person" they may be
terminated.

Id. Plaintiff then recommended to the Board that it implement a proposed three-part

employment plan, which he detailed, to "ensure what happened to [him] does not ever

happen again to any police officer in the City of Salisbury[.]" (Def. Ex. S at 2.) The plan

involved: (1) an acknowledgment by the Board of Aldermen and the Mayor that they

have no right to interfere with police officers in the performance of their duties, and no

right either to tell police officers how to enforce certain laws, or to tell police officers not

to enforce certain laws, citing as an example, "D.W.I enforcement"; (2) a proposal that

each employee of the police department enter into a contract of employment with the

City, with terms of the contract to govern termination of employment, discipline, and

termination of the employment contract; and (3) a procedure by which complaints against

police officers are to be made in writing to the Chief of Police, with subsequent

investigation of the complaints. Id. at 2-3. Plaintiff contended in this letter that

implementation of these procedures would be good for police department employees as

well as for the community as a whole. "From a Community Betterment standpoint, the

citizens of Salisbury will be happy to know that they can count on the police to perform

their duties in a professional and ethical way, without political interference." Id. at 4.

Plaintiff concluded the letter as follows:

> I will be contacting many of the police agencies throughout the state which have contracts with their police department personnel in order to obtain copies of those contracts. After discussion and input from the other police department employees, I will submit a proposed contract to the Board of Aldermen at the next city council meeting.

Id.

Plaintiff delivered a copy of this letter to all members of the Board of Aldermen and to KOMU. The Chief of Police was also aware of this letter. Plaintiff believed, but was not certain, that he delivered a copy of one or both of his letters to a family who had lost a child in an accident involving a drunken driver.

Sometime after he wrote his first letter, and prior to the meeting at which his employment was terminated, Plaintiff spoke with a reporter from KOMU. He then scheduled a time to meet with the reporter and arranged to have the reporter accompanying him on a "ride-along." In his deposition, Plaintiff stated that the purpose of communicating with KOMU was to make public what was going on, specifically referencing "the meetings with the mayor about not stopping people for minor traffic offenses and not arresting drunk drivers within the City limits." (Wright Dep. at 128-29.) The Chief of Police was aware of the interview and ride-along, and discussed it with the City Attorney.

A scheduled meeting of the City Council took place on October 11, 2007, over which all individual Defendants presided. Plaintiff attended the meeting, as did the City Attorney. A camera crew from the KOMU television station was present, and members

of the Strodtman family, who had lost a daughter in a drunk driving accident, also attended. The agenda for the October 11 City Council meeting provided a scheduled time for "citizen discussion," and it listed the Strodtman family as participants related to this discussion. (Def. Ex. 12., Doc. #17-15 at 1) In his deposition, Defendant Farnen acknowledged that Plaintiff's allegations regarding DWI enforcement were part of the reason the Strodtman family was there. (Farnen Dep. at 23.) At this "citizen discussion" portion of the meeting, the Strodtmans asked "if it was true that the Mayor said to not stop drunk drivers in Salisbury." (Def. Ex. 13 at 1, Doc. #17-15 at 2; Fehling Dep. at 23-25.) The Mayor responded that there were no policy changes regarding drunk drivers in the City of Salisbury. Id. Plaintiff did not participate in this citizen discussion.

During the remainder of the City Council meeting, Plaintiff spoke only in regard to the agenda item of Sobriety Test Training, which had been the subject of a previous Police Committee meeting. Plaintiff specifically spoke in regard to sending an officer to receive training as an instructor for standardized field sobriety testing. The Board of Aldermen asked questions of Plaintiff and other officers regarding the program, and, upon completion of the discussion, voted to send an officer other than Plaintiff for such training. (Def. Ex. 13 at 3; Pl.'s Dep. at 164-67.)

At the conclusion of the specific agenda items for the October 11 meeting, the City Council went into closed, or executive, session. Upon conclusion of the closed session, the Council returned to open session and discussed the City's budgetary concerns. Budgetary issues were not listed on the meeting agenda. The Council then voted to

eliminate the full-time police officer position then held by Plaintiff, who was the least senior officer in the agency, with such elimination to be effective immediately. Budgetary concerns were offered as the reason the position was eliminated. Plaintiff's employment with the City of Salisbury was thereby terminated. In his deposition, the Police Chief testified that prior to the meeting, the City Council did not discuss with him any budgetary concerns or the proposed elimination of a police officer position. Because Plaintiff left the meeting during the closed session, he was not present during this vote, and he learned of the employment decision the following morning.

After the elimination of Plaintiff's full-time position, Plaintiff was not permitted to remain as a part-time reserve officer for the City. (Fehling Dep. at 36-38.)

**C.    Discussion**

In Count I of his Complaint, Plaintiff claims that the vote to terminate his employment on October 11, 2007, and the subsequent refusal to employ him as a part-time reserve officer, was in retaliation for his speaking publicly on a matter of public concern regarding the safety of the citizens of the City. Specifically, he alleges that the termination was a result of his public complaints regarding Mayor Fehling's request that Plaintiff, in his capacity as a police officer, refrain from arresting individuals for driving while intoxicated.

In their motion for summary judgment, Defendants contend that Plaintiff did not engage in protected speech within the meaning of Garcetti, asserting that Plaintiff's speech did not deal with law enforcement policy generically, but rather was simply an

attempt by Plaintiff to obtain clarification regarding how to conduct himself. Further, Defendants assert that the letters of September 22 and October 1, 2007, were in connection with and pursuant to Plaintiff's employment. In support of their argument that Plaintiff did not speak as a public citizen, Defendants cite Plaintiff's deposition testimony that the Chief of Police directed him to circulate the letters to the Board of Aldermen; that in the second letter Plaintiff stated that it was prepared at the Mayor's request and because he understood the Board of Aldermen were also requesting a response; and that neither letter identified anyone outside of the City's government to whom Plaintiff had spoken.[6]

1. Whether Plaintiff Engaged in Protected Speech

The Court is not persuaded by Defendants' argument that Plaintiff's speech involved a matter of private, rather than public, concern. In his Complaint, Plaintiff identifies as the matter of public concern about which he spoke, the public safety of citizens arising from the Mayor's directive not to enforce the laws relating to driving while intoxicated. From a factual standpoint, this concern and concerns related thereto, such as the risk of consequent liability, were plainly addressed in Plaintiff's letters. From

---

[6] Defendants also argue that Plaintiff could articulate no reason for believing that either letter was given to anyone other than the Board. But the Court finds no record support for this assertion. To the contrary, Plaintiff unequivocally identified several public entities to whom he circulated his letters, including MADD and a television station. The portions of the record cited by Defendants do not support their assertion. Rather, at the pages of the deposition cited by Defendants, Plaintiff simply testified that he had no reason to believe that the Mayor or members of the Board of Aldermen necessarily knew that he had provided the letters to others.

a legal standpoint, there can be little doubt that this involves a matter of public concern. "[P]ublic safety issues are obvious examples of matters that are of concern to the general public." McGee, 471 F.3d at 920. Indeed, criticism of government officials and policy, in itself, falls within the meaning of speech on a matter of public concern. See Garcetti, 547 U.S. at 425 ("Exposing governmental inefficiency and misconduct is a matter of considerable significance."); Lindsey v. City of Orrick, Mo., 491 F.3d 892, 899 (8th Cir. 2007) ("Criticism . . . of government officials and their policies clearly addresses matters of public concern").

Plaintiff's speech also undoubtedly included matters of personal interest, such as the impact of the Mayor's directive on his continued employment. The Eighth Circuit has explained that when an employee's speech includes matters of both public concern and personal interest, a court

> must analyze the content, form, and context of the speech to determine whether the speaker was acting primarily as a concerned citizen or as an employee. If the speech was mostly intended to further the employee's private interests rather than to raise issues of public concern, her speech is not protected, even if the public have an interest in the topic of the speech.

Bailey v. Dep't of Elementary & Secondary Educ., 451 F.3d 514, 518 (8th Cir. 2006) (citation omitted); see also Altonen, 487 F.3d at 559.

Based on the record as a whole, including the content of the letters and the persons and entities to whom the letters were delivered, the Court finds that Plaintiff's speech was not primarily intended to further his private interests, but rather primarily concerned a matter of public import, namely, whether law enforcement officers should be permitted to

arrest local residents for driving while intoxicated, and the dangers to the public of disallowing such arrests. As such, under the tests set forth in <u>Bailey</u> and <u>Garcetti</u> and its progeny, the Court concludes that Plaintiff engaged in speech related to a matter of public concern.

In their motion, Defendants further argue that Plaintiff's speech was made pursuant to his employment duties within the meaning of <u>Garcetti</u>. Defendants cite to Plaintiff's testimony that the Chief of Police directed him to send the first letter to the Board of Aldermen, and contend that the second letter, per its own language, was simply to respond to the Board's and the Mayor's questions. The Court, however, is not persuaded, and finds the facts presented here to be unlike those in <u>Garcetti</u>.

In <u>Garcetti</u>, a deputy district attorney claimed that he suffered a series of retaliatory employment actions after he wrote a memorandum to his supervisors recommending dismissal of a prosecution because of flaws in an affidavit. The Supreme Court held that the deputy did not enjoy First Amendment protection for his statements in the memo because he had drafted the document "pursuant to [his] official duties." <u>Garcetti</u>, 547 U.S. at 421. Because drafting the memorandum was "part of what he, as a calendar deputy, was employed to do," the plaintiff had not spoken as a citizen, and thus the First Amendment did "not insulate [his] communications from employer discipline." <u>Id.</u> The Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes." <u>Id.</u>

In Garcetti, the parties agreed that the memo in question was drafted pursuant to the plaintiff's employment duties; accordingly, the Court "[had] no occasion to articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate." Id. at 424. The Court did, however, stress the "practical" nature of the inquiry and instructed that the test should not focus solely on "[f]ormal job descriptions" because they "often bear little resemblance to the duties an employee actually is expected to perform." Id. at 424-25. Thus, "the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes." Id. at 425.

Here, if Plaintiff had both written and provided his letters to the Board of Aldermen at the direction of the Chief of Police, and those were the only persons to whom he communicated his views at issue, a strong argument could be made that Plaintiff's acts in sending the letters in question to the Board of Aldermen constituted speech made pursuant to his job duties, and thus speech not protected by the First Amendment. See McGee, 471 F.3d at 921; Bailey, 451 F. 3d at 519-20 (holding that employee did not engage in protected speech by expressing disagreement with supervisor about department procedures and by writing to management complaining about supervisor and procedures); Callahan v. Fermon, 526 F.3d 1040, 1045 (7th Cir. 2008) (holding that police officer's comments at a police meeting on a matter of public concern was not protected speech), cert. denied, 129 S. Ct. 2734 (2009); Mills, 452 F.3d at 648

(holding that comments made by police officer, when on duty and in uniform, in discussion with her superiors, was speech made in her capacity as an employee).

But that is not the case before this Court. From a factual standpoint, the record does not support Defendants' contention that the letters were written at the direction of the Chief of Police. Rather, Plaintiff wrote the first letter without direction from anyone, and drafted it broadly, addressing it "To Whom it May Concern." The Chief had no objection to the letter and simply agreed that it would be appropriate to send the letter to the Board of Aldermen. Even if one were to accept that the Police Chief instructed Plaintiff to provide a copy to the Board of Aldermen, Defendants cite to no evidence suggesting that the Police Chief had any role in Plaintiff's decision to write the letter or to provide it to others, such as MADD and a local television station.

Moreover, it was not within Plaintiff's job duties to voice concern over the broader public policy issues, or to voice concern over possible liability to the City that could result from following the Mayor's directives. Further, Plaintiff went beyond complaining to the Board of Aldermen, and brought his concerns to KOMU and MADD, and probably also to a family whose daughter had been the victim of a drunk driving accident. The record leaves little doubt that Plaintiff's duties did not include sharing his views on the matters discussed in his letters with the media or with interested citizens' organizations, even under a broad view of the meaning of actions "pursuant to" an employee's "official duties." See Brammer-Hoelter v. Twin Peaks Charter Acad., 492 F.3d 1192, 1203 (10th Cir. 2007) (holding that if speech "reasonably contributes to or facilitates the employee's

performance of the official duty, the speech is made pursuant to the employee's official duties").  As such, Plaintiff's speech ceased to be merely pursuant to his official duties and became the speech of a concerned citizen.

Cases decided after Garcetti instruct the Court that the fact that the letters were written while Plaintiff was still employed by the City and were to a large extent about his job or his concerns over his own continued employment do not remove his speech from the ambit of constitutional protection.  See Andrew v. Clark, 561 F.3d 261, 268-69 (4th Cir. 2009) (indicating, in the context of reversing the grant of a motion to dismiss, that former police commander's releasing to a newspaper an internal memorandum on a matter of public concern involved protected speech, even though the memorandum discussed whether the commander had properly performed his job in connection with a police shooting); Thomas v. City of Blanchard, 548 F.3d 1317, 1323-24 (10th Cir. 2008) (holding that when city building code inspector went beyond complaining to his supervisors about an impropriety in issuing a certificate of occupancy to the mayor, and threatened to report to a state investigative agency outside his chain of command, his speech ceased to be merely pursuant to his official duties and became the speech of a concerned citizen; "The question under Garcetti is not whether the speech was made during the employee's work hours, or whether it concerned the subject matter of his employment. . . .  Rather, it is whether the speech was made pursuant to the employee's job duties, or in other words, whether it was 'commissioned' by the employer") (quoting Garcetti, 547 U.S. at 421-22); Davis v. McKinney, 518 F.3d 304, 313 (5th Cir. 2008)

(surveying post-<u>Garcetti</u> case law and concluding that complaints raised up the chain-of-command in a public workplace are often viewed as being pursuant to one's job duties while "external communications" in which a public employee raises concerns to persons outside the workplace are "ordinarily not made as an employee, but as a citizen"); <u>Williams v. Dallas Ind. Sch. Dist.</u>, 480 F.3d 689, 694 & n.2 (5th Cir. 2007) (holding that a high school athletic director and head football coach's memoranda to the high school's office manager and principal questioning the handling of school athletic funds were not protected by the First Amendment; noting that "[t]his is not a case where [the plaintiff] wrote to the local newspaper or school board with his athletic funding concerns"); <u>Casey v. West Las Vegas Ind. Sch. Dist.</u>, 473 F.3d 1323, 1329-1333 (10th Cir. 2007) (holding that superintendent of school district spoke as district employee when she conveyed to board her concern about district's lack of compliance with federal regulations governing Head Start program, when she instructed subordinate to contact federal authorities about illegal enrollments in the program, and when she related to board members her concerns about board's failure to comply with state open meetings law; but she spoke as a private citizen when she wrote to state's attorney general about alleged violations of state open meetings law); <u>Hailey v. City of Camden</u>, No. 01-3967, 2006 WL 1875402, at *15-16 (D. N.J. July 5, 2006) (holding that deputy fire chiefs spoke as citizens, not pursuant to their job duties, when they voiced complaints in the newspaper and at city council meetings, <u>mod. in part on other grounds</u>, __ F. Supp. 2d __, 2009 WL 1228492 (D.N.J. 2009); <u>cf. Nixon v. City of Houston</u>, 511 F.3d 494, 498-99 (5th Cir. 2007) (holding that city police

officer's comments to media at the scene of accident criticizing police department's high-speed chase policy were made pursuant to his official duties and during course of performing his job and thus was not protected against retaliation by the city police department under the First Amendment; officer spoke to media while on duty, in uniform, while working at scene of the accident), cert. denied, 128 S. Ct. 2504 (2008); but see Omokehinde v. Detroit Bd. of Educ., 563 F. Supp. 2d 717, 726 (E.D. Mich. 2008) (holding that state employee's anonymous letter to newspaper stood on same legal footing as her prior internal complaints to supervisor; relying in part on district court opinion in Andrew v. Clark, 561 F.3d 261, which was later reversed in relevant part).

The Court notes that in Bailey, the Eighth Circuit, in finding that the plaintiff's statements at a meeting and in a letter were not protected speech, twice noted that the statements at issue in that case were not addressed to the public. Bailey, 451 F.3d at 519, 520.

Based on the record as a whole, the Court finds that Plaintiff wrote his letters, especially his first letter, for public dissemination and did not do so pursuant to his employment duties. He thereafter delivered the letters to the members of the public, including a public television station, as well as to the members of the Board of Aldermen. As such, the Court finds that Plaintiff's First Amendment claim, premised on his publicly disseminated letters, involves protected speech. Normally this would not conclude the analysis, as the Court would then proceed with a balancing under Pickering. However, Defendants made no argument in their motion under Pickering, and therefore, there is no

basis for any determination that Defendants are entitled to judgment as a matter of law under Pickering.

    2.  Causation

Defendants also claim that Plaintiff's speech, as reflected in his letters, was not the cause of his termination, and that they are entitled to judgment on this basis, as well.  The record herein, however, contains nothing more than citation to certain other conduct by Plaintiff, and generalized statements that the City had ample basis to terminate Plaintiff on other grounds.  Such generalized statements do not establish that such other grounds were the basis for Plaintiff's termination, or even that Defendants would have terminated Plaintiff, or eliminated his position, on other grounds even absent any protected speech.

On the other hand, there is ample evidence in the record from which a jury could conclude both that Defendants were aware of Plaintiff's speech to other members of the public prior to their vote to terminate his position, and that his protected speech was the cause of his termination.  For example, Defendant Farnen testified that prior to the meeting at which Plaintiff's position was eliminated, he had a message from a KOMU reporter requesting an interview regarding this matter.  (Farnen Dep. at 6, Doc. #26-11 at 4.)  The Mayor had also been contacted by a reporter, but could not recall when. (Fehling Dep. at 26, Doc. #17-11 at 26.)  Defendant Stephens heard the subject being discussed among members of the public in town (Stephens Dep. at 8-9, Doc. #26-10 at 5-6), and Defendant Hubbard testified that "It was a pretty hot discussion around town." (Hubbard Dep. at 8, Doc. #26-10 at 5).  As such, the Court finds that genuine issues of

material fact remain on whether Plaintiff's protected speech was a substantial or motivating factor in the termination of his employment, precluding summary judgment for Defendants on his First Amendment retaliation claim.

**D.    <u>Qualified Immunity</u>**

The individual Defendants argue that even if Plaintiff has an actionable claim under § 1983 for First Amendment retaliation, they are entitled to qualified immunity on this claim.

> The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.  The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.

<u>Pearson v. Callahan</u>, 129 S. Ct. 808, 815 (2009) (citations omitted).

Courts employ a two-part inquiry to determine whether public officials are entitled to qualified immunity: (1) whether the facts, taken in the light most favorable to the plaintiff, show that the official's conduct violated a constitutional right; and (2) whether the right was "clearly established."  A court has discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.  <u>Id.</u>  The "clearly established" inquiry asks "whether it would be clear to a reasonable official that his conduct was unlawful in the

situation he confronted." <u>Lindsey</u>, 491 F.3d at 897 (quoting <u>Saucier v. Katz</u>, 533 U.S. 194, 202 (2001)). As this matter is before the Court on Defendants' motion for summary judgment, the Court construes the facts in the light most favorable to Plaintiff. <u>See</u> <u>Brown v. City of Golden Valley</u>, 574 F.3d 491, 496 (8th Cir. 2009).

This Court concluded above that Plaintiff has asserted a viable First Amendment violation. The question then is whether Plaintiff's First Amendment right was clearly established such that a reasonable official would have had fair warning that firing Plaintiff was unlawful. <u>See id.</u> at *6; <u>Lindsey</u>, 491 F.3d at 901. "Whether the facts alleged support such a claim is a legal question for the court to decide." <u>Brown</u>, 574 F.3d at 499 (citing <u>Kahle v. Leonard</u>, 477 F.3d 544, 549 (8th Cir. 2007)).

That a public employee, in proper circumstances, has protection under the First Amendment "to speak as a citizen addressing matters of public concern" has long been recognized. <u>See</u> <u>Garcetti</u>, 547 U.S. at 417 (citing cases). The Supreme Court in <u>Garcetti</u> further refined the test to be applied in assessing when such speech by a public employee qualifies for protection. When these events occurred in October 2007, however, the law was sufficiently clear that it was unconstitutional to fire a public employee for speaking in a public manner about an important matter of public safety. In this regard, the Court notes that "there need not be a case with materially or fundamentally similar facts in order for a reasonable person to know that his or her conduct would violate the Constitution." <u>Brown v. Fortner</u>, 518 F.3d 552, 561 (8th Cir. 2008) (quoting <u>Young v. Selk</u>, 508 F.3d 868, 875 (8th Cir. 2007)).

In October 2007, the law was sufficiently clear to put Defendants on notice that Plaintiff's speech was protected, and that termination in retaliation for such speech would violate Plaintiff's First Amendment rights. In <u>Lindsey</u>, a post-<u>Garcetti</u> case decided in June, 2007, the Eighth Circuit, on facts similar to those presented here, held that the district court had correctly concluded that the defendants were not entitled to qualified immunity. <u>Lindsey</u>, 491 F.3d at 902-03; <u>see also</u> <u>Rush v. Perryman</u>, No. 1:07CV00001 SWW, 2007 WL 2091745, at *5 (E.D. Ark. July 17, 2007), <u>aff'd</u>, ___ F.3d ___, 2009 WL 2778310 (8th Cir. 2009). The Court in <u>Lindsey</u> noted that "no right is more clearly established than freedom of speech, and speech alleging illegal misconduct by public officials occupies the highest rung of First Amendment hierarchy," and that it was "clearly established a public employer may not discharge an employee for disclosing the potential illegal conduct of public officials." <u>Lindsey</u>, 491 F.3d at 902. Based on this authority, this Court concludes that the individual Defendants are not entitled to qualified immunity on Plaintiff's First Amendment claim.

## Count II – Missouri Sunshine Law

In Count II of his Complaint, Plaintiff alleges that all Defendants violated the Missouri Sunshine Law, Mo. Rev. Stat. §§ 610.010, <u>et</u> <u>seq.</u>, in relation to the City Council meeting of October 11, 2007, by (1) failing to provide notice to the public that a budgetary problem would be discussed; (2) going into closed session without announcing the reason for doing so; and (3) discussing a matter in closed session that is required to be discussed in a public session. Plaintiff requests statutory penalties and attorney's fees for

establishing said violations. Plaintiff further requests the Court to void Defendants' action taken at this meeting in violation of the Missouri Sunshine Law, and specifically, the action taken to terminate Plaintiff's employment as a police officer with the City.

Upon review of the Defendants' Motion for Summary Judgment and the materials and briefs submitted in support of each party's position on the claims raised in Count II of Plaintiff's Complaint, the Court finds there to be genuine issues of material fact in dispute between the parties, including, but not limited to, whether the subjects addressed during the City Council's closed session on October 11, 2007, involved matters not related to those permitted to be the subject of closed meetings as set out in Mo. Rev. Stat. § 610.021; and whether the decision to terminate Plaintiff's employment arose out of any such matters. Cf. Hanten v. Sch. Dist. of Riverview Gardens, 183 F.3d 799, 810 (8th Cir. 1999) (finding no evidence to contradict defendants' evidence which established that impermissible subject was not discussed during closed portion of meeting). On the information before the Court, and viewing all facts and inferences in the light most favorable to Plaintiff, see Matsushita Elec., 475 U.S. at 587, it cannot be said that Defendants have established their right to judgment with such clarity as to leave room for no controversy or that Plaintiff is not entitled to prevail on this claim under any discernable circumstances. See Vette Co. v. Aetna Cas. & Sur. Co., 612 F.2d 1076, 1077 (8th Cir. 1980).

Therefore, to the extent Defendants seek judgment as a matter of law on Count II of Plaintiff's Complaint, Defendants' Motion for Summary Judgment is denied.

## Count III – Wrongful Discharge

In Count III of his Complaint, Plaintiff alleges that the City wrongfully discharged him from his employment in violation of Missouri public policy. Plaintiff does not bring this claim against any individual Defendant. In their Motion for Summary Judgment, Defendants argue that the City is protected from such a claim by sovereign immunity. For the following reasons, Defendants' argument is well taken.

"Generally, an employee who does not have a contract which contains a statement of duration is an employee at-will and may be discharged at any time, with or without cause, and the employer will not be liable for wrongful discharge." Dunn v. Enter. Rent-A-Car Co., 170 S.W.3d 1, 6 (Mo. Ct. App. 2005) (citing Luethans v. Washington Univ., 894 S.W.2d 169, 172 (Mo. 1995)). Missouri courts, however, recognize a public policy exception to this employment at-will doctrine. Id.; see also Porter v. Reardon Mach. Co., 962 S.W.2d 932, 937 (Mo. Ct. App. 1998), and cases cited therein. This public policy exception provides a cause of action to an at-will employee whose employment was terminated by his employer in violation of a clear mandate of public policy. Dunn, 170 S.W.3d at 6. The public policy exception is triggered when an employee is terminated for:

> "(1) refusing to perform an illegal act or an act contrary to a strong mandate of public policy; (2) reporting wrongdoing or violations of law or public policy by the employer or fellow employees to superiors or third parties; (3) acting in a manner public policy would encourage, . . . ; or (4) filing a workers' compensation claim."

Id. (quoting Porter, 962 S.W.2d at 936-37).

With respect to a municipality's termination of a city employee's employment, however, sovereign immunity applies to such action inasmuch as the action is performed as a part of the municipality's governmental function. Topps v. City of County Club Hills, 272 S.W.3d 409, 414 (Mo. Ct. App. 2008) (quoting Kunzie v. City of Olivette, 184 S.W.3d 570, 574 (Mo. 2006)); Junior Coll. Dist. of St. Louis v. City of St. Louis, 149 S.W.3d 442, 447 (Mo. 2004). Specific exceptions can apply to a municipality's sovereign immunity,[7] and a municipality can specifically waive its immunity. Topps, 272 S.W.3d at 414. Such waiver may be accomplished by the purchase of insurance covering tort claims, but "the extent of that waiver is expressly dictated, and limited, by the terms of the insurance policy." Id. at 415.

At all times relevant to this cause of action, the City participated in the Missouri Public Entity Risk Management (MOPERM) fund for its insurance coverage. The MOPERM "Memorandum of Coverage" sets forth the coverage provided, as well as applicable exceptions. Specifically, the Memorandum of Coverage provides "[c]overage for the [City] for claims on causes of action established by Missouri Law" arising out of "operation of motorized vehicles" and "[i]njuries caused by the condition of a public entity's property." (MOPERM Memorandum at Sec. I.A.1.) The Memorandum of Coverage further provides that it is not to "be construed to broaden the liability of the

_____

[7]Section 537.600 of the Missouri Revised Statutes specifically sets forth two specific exceptions to sovereign immunity: (1) where injuries result from a public employee's negligent operation of a motor vehicle within the course of employment; and (2) where injuries are caused by a dangerous condition of the municipality's property.

[City] beyond the provisions of sections 537.600 to 537.610 of the Missouri Statutes,[8] nor to abolish or waive any defense at law which might otherwise be available to the [City] or its officers and employees." (Id. at Sec. I.B.) Citing identical disclaimer language from the MOPERM policy, the Missouri Court of Appeals recently noted that Missouri courts interpret this language "'to limit the public entity's liability coverage to only those claims involving the operation of a motor vehicle or the dangerous conditions of public property.'" Topps, 272 S.W.3d at 417-18 n.6 (quoting Grospitz v. Abbott, Nos. 04-4072-CV-C-NKL, 04-4073-CV-C-NKL, 04-4074-CV-C-NKL, 2005 WL 2649707, at *8 (W.D. Mo. Oct. 17, 2005)).

The plain language of the insurance coverage extended under the MOPERM policy does not insure the City for any of its governmental functions except those involving the operation of motor vehicles or the dangerous condition of property. "Because 'finding a municipality liable for torts is the exception to the general rule of sovereign immunity, [] a plaintiff must plead with specificity facts demonstrating his claim falls within an exception to sovereign immunity.'" Topps, 272 S.W.3d at 415 (quoting Parish v. Novus Equities Co., 231 S.W.3d 236, 242 (Mo. Ct. App. 2007)). Here, Plaintiff presents no language of the policy that specifically allows for coverage of his "violation of public policy" claim. As such, the City is entitled to sovereign immunity on such claim. Id. at 417.

Although Plaintiff appears to concede that the City is entitled to sovereign

---

[8]Sections 537.600 to 537.610 of the Missouri Statutes govern sovereign immunity.

immunity on his claim of wrongful discharge, he argues that this claim nevertheless survives against the individual Defendants inasmuch as the MOPERM policy provides for coverage of such claims against public officials and employees. (Doc. #20 at 23.) A review of Plaintiff's Complaint, however, reveals no claims asserted by Plaintiff against the individual Defendants; Plaintiff asserted his claim of wrongful discharge against the City, alone, and relief is sought only from the City. Although Plaintiff names and seeks relief from each Defendant, including the individual Defendants, in Counts I and II of his Complaint, the same is not true with respect to Count III. In Count III, Plaintiff neither names nor alleges any wrongful conduct on the part of any individual Defendant.

Accordingly, because the City of Salisbury is protected from liability by sovereign immunity on Plaintiff's claim of wrongful discharge, it is entitled to judgment as a matter of law on Plaintiff's claim as raised in Count III of Plaintiff's Complaint.

Therefore, for all of the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendants' Jointly Filed Motion for Summary Judgment is **GRANTED** as to Count III of Plaintiff's Complaint, and **DENIED** as to Counts I and II of Plaintiff's Complaint. [Doc. #16]

**IT IS HEREBY ORDERED** that a new scheduling conference shall be set by separate Order.

_____
AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated this 10th day of September, 2009.